

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-3-2003

# Lewis v. Pinchak

Precedential or Non-Precedential: Precedential

Docket No. 00-2425

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Lewis v. Pinchak" (2003). *2003 Decisions.* Paper 89.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/89

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed November 4, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-2425

LESTER LEWIS
Appellant

v.

STEVEN PINCHAK; ATTORNEY GENERAL
OF THE STATE OF NEW JERSEY

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civil Action No. 99-cv-03805)
District Judge: Honorable William G. Bassler

Argued: June 3, 2003

BEFORE: ALITO, ROTH and STAPLETON, *Circuit Judges*

(Opinion Filed November 4, 2003)

Annette Verdesco (Argued)
Pope, Bergrin & Verdesco
572 Market Street
Newark, NJ 07105
    Attorney for Appellant

Russell J. Curley (Argued)
Office of Attorney General
 of New Jersey
Division of Criminal Justice
Richard J. Hughes Justice Complex
Trenton, NJ 08625-0086
 Attorney for Appellees

---

## OPINION OF THE COURT

---

STAPLETON, *Circuit Judge*:

In 1990, a New Jersey jury convicted Lester Lewis, the Petitioner in this habeas proceeding, of two counts of first-degree attempted murder, two counts of second-degree aggravated assault, two counts of third-degree aggravated assault with a deadly weapon, and second-degree possession of a firearm with the purpose to use it unlawfully against another. Lewis was sentenced and thereafter exhausted his right to direct appeal in the New Jersey state courts.

In 1994, Lewis's first petition for a writ of habeas corpus to the United States District Court for the District of New Jersey was dismissed for failure to exhaust state remedies. Lewis then petitioned the New Jersey Superior Court for collateral relief. Among other things, Lewis alleged that the state court failed to honor his request that the jury be instructed that it was to draw no adverse inference from Lewis's decision not to testify. The Superior Court denied the petition, finding that the claim should have been raised on direct appeal.

The New Jersey Superior Court, Appellate Division, affirmed the judgment. It first concluded that Lewis was entitled to the requested instruction pursuant to *Carter v. Kentucky*, 450 U.S. 288 (1981), and that the instruction was not given. The court then noted that the issue had not been raised on direct appeal. It affirmed the denial of relief, however, on the ground that the failure to give the instruction "was not such as to be capable of producing an unjust result." App. at 39. The court observed that Lewis

did, in effect, testify at trial because he represented himself and the trial judge gave him wide latitude in presenting his version of events while examining other witnesses and during opening and summation. The court also noted that identity was not a significant issue in this case since Lewis was well known to his victims, who had identified him as their attacker. The New Jersey Supreme Court denied the Appellant's petition for certification.

In 1999, Lewis again unsuccessfully petitioned the United States District Court for the District of New Jersey for habeas corpus relief. Regarding the request for a no-adverse-inference instruction, the District Court noted that Lewis was required to fairly present his federal claims in state court in order to satisfy the exhaustion requirement of 28 U.S.C. § 2254. It then concluded that Lewis had only alleged violations of state law. Lewis now appeals the District Court's disposition of his no-adverse-inference claim.

Before us, Respondent contends that Petitioner failed to raise a federal, no-adverse-inference claim in either the state courts or the federal district court. Alternatively, he urges us to conclude that the state court's failure to give the requested instruction was harmless error.

Lewis insists, with some record support, that he raised his federal claim in the state courts as well as in the District Court. The opinion of the New Jersey Superior Court, Appellate Division, can be read as recognizing and resolving a federal claim. That court acknowledged that Lewis was entitled to a no-adverse-inference instruction and cited *Carter v. Kentucky* in support of that proposition. *Carter* held that "a state trial judge has the [federal] constitutional obligation, upon proper request, to minimize the danger that the jury will give evidentiary weight to a defendant's failure to testify." 450 U.S. at 305. Additionally, Lewis's petition to the District Court quoted from the portion of the Appellate Division's opinion stating that he had a right to a no-adverse-inference charge under *Carter v. Kentucky*. He also referenced his "right" to have the judge charge the jury, at his request, that his failure to testify should not be considered a sign of guilt.

We decline to resolve this appeal on exhaustion grounds, deeming it far more efficient to reach the merits of Petitioner's claim and terminate the proceedings on Lewis's *Carter* claim. If we regard an application for a writ of habeas corpus to be without merit, 28 U.S.C. § 2254(b)(2) affords us the alternative of ignoring any failure to exhaust state remedies and addressing the merits of the petition. *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001). We elect to pursue that course.

"In *Carter v. Kentucky*, the Court held that the trial court must, at the request of the defendant, instruct the jury that a defendant is not compelled to testify and the fact that he or she does not testify cannot be used as an inference of guilt." *United States v. Simmons*, 679 F.2d 1042, 1049 (3d Cir. 1982). Neither party disputes that Lewis requested a no-adverse-inference instruction at trial, and that, in violation of *Carter*, the trial court failed to give such jury instruction. Accordingly, an error of constitutional dimension occurred. Two issues remain, however: (1) was the failure to give a *Carter* instruction a structural error that requires reversal without regard to its potential for affecting the outcome; and (2) if not, was that failure harmless error in the context of this case.[1]

In *Arizona v. Fulminante*, 499 U.S. 279 (1991), the Supreme Court recognized a distinction between structural defects, which require reversal, per se, and trial errors, which require a reviewing court to engage in harmless error analysis. Structural defects are "defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." *Id.* at 309. A structural defect "affect[s] the framework within which the trial proceeds, rather than simply an error in the trial process itself. Without these

---

1. It is not clear to us whether the holding of the Appellate Division of the New Jersey Superior Court was a merits decision grounded in harmless error law or a process ruling grounded in "plain error" law. *See* Rule 2:10-2 cited by the court and pertaining to review of alleged error not objected to at trial. As a result, we are unable to determine whether the deferential standard of review required by 28 U.S.C. § 2254(d) is applicable here. It is not necessary for us to make that determination, however, because the petition must be dismissed under any potentially applicable standard.

basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Id.* at 310 (internal quotations omitted). A trial error, on the other hand, is an "error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Id.* at 307-08. Structural errors have been found in a "very limited class of cases." *Johnson v. United States*, 520 U.S. 461, 468-69 (1997) (citing precedent finding structural errors for (1) a total deprivation of the right to counsel; (2) lack of an impartial trial judge; (3) unlawful exclusion of grand jurors on the basis of race; (4) denial of the right to self-representation at trial; (5) denial of the right to a public trial; and (6) an erroneous reasonable doubt instruction to the jury).

While the Supreme Court has not decided whether a judge's failure to give a *Carter* instruction is a structural error requiring reversal, per se, we are confident that, when presented with the issue, it will hold that *Carter* errors are subject to harmless error analysis. Our confidence is predicated primarily on *Chapman v. California*, 386 U.S. 18 (1967), and *United States v. Hasting*, 461 U.S. 499 (1983).

In *Chapman*, the state prosecutor, availing himself of express authority conferred by the state constitution, repeatedly commented on the defendants' failure to testify and suggested that inferences of their guilt should be drawn. The trial court also advised the jury that it could draw adverse inferences from the defendants' failure to testify. The Supreme Court held that defendants' Fifth Amendment rights under *Griffin v. California*, 380 U.S. 609 (1965), had been violated. It concluded, however, that the error could be regarded as harmless if the court is "able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24. The Court ultimately concluded that, under the circumstances of that case, it was "impossible . . . to say that the State [had] demonstrated, beyond a reasonable doubt, that the prosecutor's comments and the trial judge's instruction did

not contribute to petitioners' convictions." *Chapman*, 386 U.S. at 26.

In *Hasting*, the Court once again applied harmless error analysis to a *Griffin v. California* violation, this time concluding that the state had shown harmless beyond a reasonable doubt the prosecutor's comments on the failure of the defense to offer evidence.

*Chapman* and *Hasting* were decided before *Fulminante*, and the Court's analysis is not structured in terms of a dichotomy between "structural error" and "trial error." Both are cited with approval by the *Fulminante* Court, however, and a prosecutor's comment on a defendant's failure to testify fits comfortably within that Court's description of trial error. Conversely, such comments are difficult to characterize as "defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." *Fulminante*, 499 U.S. at 309. Accordingly, we conclude that *Chapman* and *Hasting* remain the law of the land.

Having so concluded, we find ourselves unable to meaningfully distinguish those cases. Indeed, it would seem that the appropriate conclusion here follows *a fortiori* from the conclusions reached there. The same constitutionally protected interest is at stake when there is a *Carter* violation and, if anything, the jeopardy to that interest is greater when a prosecutor improperly comments on a defendant's failure to testify. A prosecutor's comment on a defendant's decision not to testify affirmatively places the inference of guilt before the jury, while the failure to instruct the jury only creates the possibility that the jury will, on its own, draw an inference of guilt. *See Richardson v. Lucas*, 741 F.2d 753, 754-55 (5th Cir. 1984) (applying harmless error analysis to a refusal to give a no-adverse-inference instruction because "prosecutorial comment on the defendant's failure to testify" was "a much more pronounced violation of the fifth amendment privilege against self-incrimination than the refusal to give the 'failure to testify' instruction" and finding no reason for distinguishing the two types of cases as far as the application of harmless error is concerned). We also perceive no material distinction between prosecutorial

comment cases and failure to instruct cases in terms of their susceptibility to a quantitative assessment of trial evidence. *See, e.g., United States v. Brand*, 80 F.3d 560, 568 (1st Cir. 1996) (finding that a failure to give a *Carter* instruction is not a structural error because "[i]t is not the sort of error for which an assessment of the evidence is unsuitable precisely because it concerns the evidentiary value the jury may give to a defendant's election not to testify on his own behalf"); *Richardson*, 741 F.2d at 755-56; *Finney v. Rothgerber*, 751 F.2d 858, 864 (6th Cir. 1985) (applying harmless error analysis to a court's refusal to give a *Carter* instruction in the enhancement phase of a bifurcated persistent felony offender proceeding); *United States v. Burgess*, 175 F.3d 1261, 1265-66 (11th Cir. 1999) (finding that *Arizona v. Fulminante* requires that harmless error analysis be applied to *Carter* errors).

We hold that the failure of a trial court to give a *Carter* instruction upon request is a trial error amenable to harmless error analysis.

Finally, we must determine whether the *Carter* error was harmless in Lewis's case. Since *Chapman*, the Supreme Court has held that its "harmless beyond a reasonable doubt" standard is inapplicable in the context of habeas corpus proceedings, as contrasted with direct review. *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Under *Brecht*, an error is not harmless if it "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. Our review of the record before us convinces us that the failure to give the *Carter* instruction did not rise to this level. Indeed, even were we to apply the more forgiving *Chapman* standard of whether there was a "reasonable possibility that the evidence complained of might have contributed to the conviction," we would still find the error harmless. *Chapman*, 386 U.S. at 23.

Here, George Bardaloo testified that Lewis, an acquaintance for 18 years, and "best friend" for ten years, arrived at the apartment Bardaloo shared with his girlfriend, Cheryl Anderson. He testified that Lewis pointed a gun at him. During a struggle, Bardaloo was shot twice, once in the neck and once in the face. Bardaloo testified that Lewis ran outside after firing the shots. Bardaloo

dialed 911 and identified Lewis as his attacker. Afterwards, Bardaloo testified that he dropped the phone and ran outside because he had heard his girlfriend, Cheryl Anderson, scream. He testified that he saw her lying on the ground and Lewis running down the sidewalk on Essex Street. He testified that he saw Lewis stop and fire two more shots, hitting him twice in the shoulder. The seemingly indestructible Bardaloo, having been shot in the neck, face, and shoulder, waited until the police arrived, identified Lewis, described the van he might be driving, and then passed out.

Anderson testified that Lewis, an acquaintance that she had met on ten or more occasions, arrived at the apartment with another man, Austin Bernard. She testified that she heard two popping noises and ran outside to get help. She testified that the next thing she remembered was being face down against the street with a person saying "Is she dead?" Anderson testified that she had been shot in the neck.

Lewis was subsequently arrested. Although he initially refused to give a statement to police, he later recanted and confessed to shooting Bardaloo and Anderson with a .380 gun. Lewis also admitted to losing a watch at the scene of the crimes. Lewis's description of the watch matched the watch that was found at the scene. Also, the evidence discovered during the investigation of the crime scene corroborated important segments of the testimony of Bardaloo and Anderson as well as Lewis's confession. A spent shell casing and blood were also found on Essex Street. Blood, spent .380 casings, and a lead bullet were found in the apartment. A phone cord extended down some stairs, leading to a phone that was off of its cradle.

Thus, the evidence implicating Lewis was overwhelming. Additionally, as the Appellate Division noted, Lewis represented himself and was accorded considerable leeway in presenting his version of events. This fact makes it far less likely that it occurred to jurors to draw an inference of guilt from Lewis's failure to formally testify. In this context, we hold that the *Carter* error was, indeed, harmless. We will AFFIRM the judgment of the District Court.

9

A True Copy:
        Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*